GREEN, C.J.
*368 On appeal from his convictions on charges of assault and battery by means of a dangerous weapon, see *369 G. L. c. 265, § 15A(b ), assault by means of a dangerous weapon, see G. L. c. 265, § 15B(b ), and unlawful possession of a firearm, see G. L. c. 269, § 10(a ), the defendant claims error in the denial of his motion to suppress evidence seized as the result of a warrantless search of his motor vehicle.[1] For the reasons set forth below, we affirm.
Background. We recite the findings of fact made by the motion judge, supplemented by the evidence in the record that is uncontroverted and undisputed, or implicitly credited by him.[2] Commonwealth v. Isaiah I., 448 Mass. 334, 337, 861 N.E.2d 404 (2007).
*313 On December 25, 2013, at approximately 4:04 A.M. , the Boston police department responded to a 911 call reporting a person shot at a house party at 92 Wales Street in Dorchester. The shooting occurred a few minutes before the 911 call was placed. Many of the partygoers left the house quickly in response to the shooting. Upon arrival, officers learned from people still inside the first-floor apartment that the victim, Rashaan O'Neil, was deceased in the basement. 92 Wales Street is approximately 200 yards from the intersection of Wales Street and Talbot Avenue, a main through street in Dorchester.
At 4:10 A.M. , six minutes after the report of the shooting at 92 Wales Street, Boston police were dispatched to respond to a "ShotSpotter" device activation[3] at 276 Talbot Avenue, at the intersection of Talbot Avenue and Aspinwall Road, about one-half mile from 92 Wales Street. Officer Michael Peters responded to the scene and found a large area of broken glass in the street at the intersection. On Whitfield Street, near its intersection with Talbot Avenue, about 320 feet from the Talbot-Aspinwall intersection, Officer Peters saw a dark-colored four-door Jaguar and a Kia Optima that each had damage consistent with having been in a recent accident. The rear of the Jaguar was only a few feet in from Talbot Avenue. The left rear corner of the Kia was about one *370 foot in front of the Jaguar's left front corner. The Kia had damage to its rear bumper. The Jaguar had damage to its passenger-side tail light, and to the front driver's side, causing the top of the left front wheel to tilt sharply outward and downward. From the wheel damage it appeared that the Jaguar was inoperable. Both vehicles were protruding at odd angles into the travel lane of Whitfield Street. The front of the Jaguar was sticking out into the travel lane with its left rear tire next to the curb. The rear of the Kia was sticking out into the travel lane with its left front tire touching the curb.
When Officer Peters first arrived at the scene there was no one in the vicinity of the Jaguar and the Kia. After making his initial observations of the vehicles, Officer Peters walked back to Talbot Avenue to block traffic. A short time later, he returned to the Talbot-Whitfield intersection where the vehicles were located and a man approached him on Whitfield Street. The man asked Officer Peters if he could retrieve his cellular telephone from the Jaguar. The officer responded "no" and informed the man that he had to move back from the accident scene. The man complied and left the scene. Officer Peters did not see the man again that night. At the motion hearing, Officer Peters identified the defendant as the man who had approached him.
While the two scenes were being secured, additional information was relayed to units on scene regarding a potential second gunshot victim, located at Carney Hospital. Officers dispatched to the hospital observed a tan-colored Toyota Camry parked outside with a shattered passenger-side window consistent with gunshot damage, and apparent blood on the front seat. The responding officers located the second victim, Zuwena Ham, who provided a brief statement during which she admitted that she was inside the basement at 92 Wales Street at the time of the fatal shooting, standing directly next to O'Neil when he was shot. Ham reported that the shooting at the Talbot-Aspinwall intersection occurred directly after she left the party at *314 92 Wales Street in the Camry. There were six occupants in the Camry. When the Camry paused to make a left turn from Talbot Avenue onto Aspinwall Road, one or more persons in a four-door car fired gunshots at the Camry. Ham was shot in the hand. The driver of the Camry, Fedelyne Maurice, who was also at the party, drove Ham to the hospital. Maurice described the shooter's vehicle as a four-door vehicle that was black or possibly dark-colored.
Upon obtaining information from officers at the two scenes and the hospital, the investigating officers suspected that the 92 Wales *371 Street shooting, the shooting at the Talbot-Aspinwall intersection, and the accident at the Talbot-Whitfield intersection were related. They treated an area along Talbot Avenue, including both of these intersections, as an extended crime scene. Officers closed off this entire strip of Talbot Avenue, putting "Boston Police" tape around the accident scene involving the Jaguar and the Kia. A subsequent line search conducted by officers revealed two bullet fragments at the Talbot-Aspinwall intersection and a shell casing at the intersection of Talbot Avenue and Colonial Avenue, about 175 feet from the Jaguar. There appeared to be a tire skid mark leading from the middle of Talbot Avenue to the Jaguar. Sergeant Detective Paul McLaughlin ordered that the Jaguar and Kia be towed from the scene to the Boston Police B-3 station in Mattapan. The vehicles were towed at about 8:12 A.M. on December 25. A few photographs were taken at the accident scene prior to the vehicles being towed.
At about 10:30 A.M. on December 25, the defendant went to the B-3 police station inquiring about the Jaguar, identifying himself as the owner. Detective James Sheehan spoke with the defendant and told him that the Jaguar could not be released at that time since it was being held for an investigation. The defendant gave Detective Sheehan his telephone number to call when the investigation was done. Between about 11:00 A.M. and 2:00 P.M. on December 26, investigators from the crime scene services unit went to the B-3 station to examine the Jaguar and the Kia. They did not search or go into the interior of the cars. Both vehicles remained locked. Only exterior photographs of the Jaguar and Kia were taken. Paint chips were taken from damaged areas of the exteriors of the vehicles that appeared to be accident impact points. After the examination was complete, the Jaguar was moved from the B-3 police station to a private towing yard. Detective Sheehan telephoned the defendant and left a message that the Jaguar could now be released to him.
On the afternoon of December 26, after the vehicles were examined by the crime scene services unit, detectives obtained and viewed a video recording from a camera at the intersection of Talbot Avenue and Bernard Street, between the Talbot-Wales intersection and the Talbot-Aspinwall intersection. The time on the recording leading up to 4:10 A.M. showed a car consistent with a gray Jaguar making several turns in the area around Wales Street and Talbot Avenue. The video also showed a car consistent with the tan Camry driving on Talbot Avenue toward Aspinwall Road. The car that looked like the Jaguar approached at a high *372 speed behind the Camry from the direction of Wales Street. At or just before 4:10 A.M. , the two cars on the video were continuing southeast toward Aspinwall Road and went out of the camera's view before reaching Aspinwall Road. After viewing the video, Sergeant Detective Paul McLaughlin completed an affidavit in support of a search warrant for the Jaguar. The detectives had the Jaguar moved from the private tow yard to the B-2 police station in Roxbury. A Superior *315 Court judge issued a search warrant on December 26. Officers searched the Jaguar on December 27 under the authority of the warrant. Items obtained from the Jaguar in the warrant search included two shell casings, clothing items, beverage bottles, fingerprints, a piece of plastic molding, photographs of the exterior and interior of the car, personal papers, and the Jaguar's event data recorder and supplemental restraint system control module.
Discussion. 1. Motion to suppress. The defendant argues that the Jaguar was seized shortly after 4:10 A.M. when he was denied access to his vehicle to retrieve his cellular telephone. The defendant claims that at that time, the police lacked probable cause to seize his car without a warrant. As such, the defendant asserts that the evidence found in the initial search of the exterior of the Jaguar and the search pursuant to the warrant must be suppressed as the fruit of an unlawful seizure and search of the vehicle that happened before the search warrant was issued. While we agree with the defendant that at the time when Officer Peters denied him access to the Jaguar, the police had seized the vehicle by asserting control over and interfering with his property rights, see Commonwealth v. Connolly, 454 Mass. 808, 819-823, 913 N.E.2d 356 (2009), we disagree that there was a lack of probable cause to justify the warrantless seizure.
"A warrantless search or seizure is presumptively unreasonable unless it falls under a recognized exception to the warrant requirement." Commonwealth v. A Juvenile (No. 2), 411 Mass. 157, 162, 580 N.E.2d 1014 (1991). A warrantless seizure must be based on probable cause. See Commonwealth v. Hason, 387 Mass. 169, 174, 439 N.E.2d 251 (1982). "Probable cause exists where 'the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), quoting from Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).
*373 Here, the police were initially dispatched to the Talbot-Aspinwall intersection at 4:10 A.M. in response to a ShotSpotter activation. Upon arrival, Officer Peters saw a large area of broken glass in the street at that intersection. Approximately 320 feet from the intersection, he observed the Jaguar and the Kia. The Jaguar was just inside the corner and pointing away from Talbot Avenue towards Whitfield Street, with the Kia about one foot in front. The appearance of the vehicles indicated that the Jaguar and the Kia had been in a recent collision. The Kia had rear-end damage, and the Jaguar had both rear and front-end damage that caused the left front wheel to sharply bend. Both vehicles were protruding at odd angles into the travel lane on Whitfield Street.
The physical appearance of the Jaguar, and its proximity to the location of the ShotSpotter activation and broken glass, as well as the temporal proximity between the activation and recent motor vehicle accident, occurring in or around 4:00 A.M. on Christmas morning, when few other vehicles were likely on the road, provided a sufficient nexus between the incriminating evidence in plain view and the accident scene. This afforded the police with probable cause to secure the scene and prevent public access to the restricted area while they continued to search the vicinity for evidence.[4]
*316 By 8:12 A.M. , when the vehicle was towed and impounded, the officers had gathered additional evidence which gave them further probable cause to believe that the accident between the Jaguar and the Kia was connected to the two shootings and that a search of the Jaguar would produce more related evidence. The shooting at the Wales Street party occurred six minutes before and one-half mile away from the shooting at the Talbot-Aspinwall intersection. At least two of the women who were shot at in the Camry had just left the party at 92 Wales Street. Ham, the woman who was struck in the hand by one of the bullets, was standing next to O'Neil in the basement when he was fatally shot. The driver of the Camry described the shooter's vehicle as a four-door *374 vehicle that was black or possibly dark-colored. The Jaguar, located about 320 feet from the Talbot-Aspinwall intersection where the SpotShotter was activated, matched the description of the motor vehicle involved in the nonfatal shooting. Further searches in the vicinity revealed a tire skid mark that led from the center of Talbot Avenue toward the Jaguar, two bullet fragments, and a discarded shell casing about 175 feet from the Jaguar.
This additional evidence, and reasonable inferences, supported a belief that the Jaguar had been rapidly traveling down Talbot Avenue prior to hitting the Kia. The motion judge properly determined that the proximity of the Jaguar, in time and location, to the two shootings showed a possible link that was enough to justify a search of the vehicle pursuant to the automobile exception to the warrant requirement. See Commonwealth v. Gentile, 437 Mass. 569, 573-575, 773 N.E.2d 428 (2002). When an automobile is stopped on a public way and probable cause exists to search it, the inherent mobility of the motor vehicle provides the exigency necessary to justify a warrantless search. Commonwealth v. Motta, 424 Mass. 117, 124, 676 N.E.2d 795 (1997). "The inherent mobility of motor vehicles ... and the reduced expectation of privacy associated with them ... justify application of the vehicular exception '[e]ven in cases where an automobile [is] not immediately mobile.' " Commonwealth v. Nicholson, 58 Mass. App. Ct. 601, 607 n.7, 792 N.E.2d 124 (2003), quoting from United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992).
The photographs and removal of paint chips from the Jaguar at the police station were proper as "the facts constituting probable cause to make the search continued to exist" after the vehicle had been towed to the B-3 station. Commonwealth v. Rand, 363 Mass. 554, 561, 296 N.E.2d 200 (1973). See id. at 560, 296 N.E.2d 200 ("The physical appearance of the car, its proximity to the scene of the hit and run, and the damage to its front end which was consistent with the type of damage expected to the hit-and-run vehicle provided sufficient nexus between the incriminating evidence in plain view and the hit-and-run accident to constitute probable cause to search the automobile for further evidence of the hit and run"). Accordingly, we are of the opinion that the officers had probable cause to believe that there would be evidence relating to the shootings at 92 Wales Street and the Talbot-Aspinwall intersection in or on the Jaguar, so as to satisfy *317 the automobile exception. The officers subsequently developed further probable cause and searched the interior of the vehicle pursuant to a valid warrant. The motion to *375 suppress was properly denied.
2. Sentencing. We likewise discern no merit in the defendant's challenge to his sentences. This court reviews sentences already appealed to the Appellate Division of the Superior Court for "errors of law or constitutional violations." Commonwealth v. Grimshaw, 412 Mass. 505, 513, 590 N.E.2d 681 (1992). "A sentencing judge has great discretion within the statutorily prescribed range 'to fashion an appropriate[,] individualized sentence.' " Commonwealth v. Cole, 468 Mass. 294, 302, 10 N.E.3d 1081 (2014), quoting from Commonwealth v. Mills, 436 Mass. 387, 399, 764 N.E.2d 854 (2002). "[A] sentencing judge may not undertake to punish the defendant for any conduct other than that for which the defendant stands convicted in the particular case." Commonwealth v. LeBlanc, 370 Mass. 217, 221, 346 N.E.2d 874 (1976). A judge may consider a variety of factors, including "the defendant's behavior, character, background, and, perhaps most important, 'the nature of the offense and the circumstances surrounding the commission of the crime.' " Commonwealth v. Jones, 71 Mass. App. Ct. 568, 572, 884 N.E.2d 532 (2008), quoting from Commonwealth v. Derouin, 31 Mass. App. Ct. 968, 970, 583 N.E.2d 1293 (1992).
The jury found the defendant not guilty of the murder of O'Neil, but guilty of assault and battery by means of a dangerous weapon for shooting Ham, assault by means of a dangerous weapon, and unlawful possession of a firearm. The trial judge's sentences fell well within the ranges permitted by statute. See G. L. c. 265, §§ 15A(b ), 15B(b ) ; G. L. c. 269, § 10(a ). The judge's comments during sentencing show that she considered the nature of the offenses and the circumstances surrounding the defendant's crimes in fashioning an appropriate sentence, not that she intended to punish the defendant for the murder of which he was acquitted. We discern no error and are confident that the sentencing judge relied solely on legally acceptable criteria in imposing sentence in this case.
Judgments affirmed.

The defendant was acquitted on a charge of murder pursuant to G. L. c. 265, § 1. In a separate claim of error, the defendant contends that the trial judge impermissibly considered the alleged murder in imposing sentence on the remaining charges.

"We conduct an independent review of the judge's application of constitutional principles to the facts found." Commonwealth v. Hoose, 467 Mass. 395, 400, 5 N.E.3d 843 (2014).

A ShotSpotter was described in testimony as "a remote sensing device" that, "based [on] an acoustic signature," makes police aware of "what may be [gun]shots." See Commonwealth v. Young, 78 Mass. App. Ct. 548, 549 n.1, 940 N.E.2d 885 (2011).

Although the argument was not presented to the motion judge, there was also an independent basis to seize the vehicle based on probable cause that the Jaguar was involved in an accident causing property damage and the driver of the vehicle had left the scene. See G. L. c. 90, § 24(2)(a ). In the conversation with Officer Peters, the defendant did not identify himself as the owner or driver of the Jaguar. Although it is unclear who, the defendant or otherwise, might have been implicated as the perpetrator of the accident, it is of no consequence to the ability of the police to seize the vehicle at that time for further investigation.